**James H. CHRISTIE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 8810.**

United States District Court
D. Oregon.

Nov. 16, 1959.

Ralph R. Bailey, Frank E. Magee, Portland, Ore., for plaintiff.

C. E. Luckey, U. S. Atty., Portland, Or., M. Carr Ferguson, Asst. U. S. Atty., Washington, D. C., for defendant.

FOLEY, District Judge.

Under 28 U.S.C.A. § 1346(a) (1), plaintiff seeks refund of cabaret taxes alleged to have been erroneously assessed and collected, and defendant, United States of America, counterclaims for assessed but unpaid cabaret tax, penalties and interest in the amount of $42,580.20 for the period October 1, 1943, through October 31, 1950, excluding the months of October, November and December, 1948, and January, 1949.

The record shows that prior to the trial a minute order was entered granting a motion to file a proposed first amended answer adding a counterclaim and that plaintiff served and filed his reply to said counterclaim. In its answer and first amended answer, defendant admitted that plaintiff filed a claim for refund of cabaret taxes in the sum of $2,000 but denied that the Internal Revenue Bureau

had taken no action on said claim for refund. And defendant, on page 4 of its brief asserts

"The claim [for refund] was rejected and taxpayer filed this suit for refund."

At the beginning of the trial Mr. Ralph R. Bailey, of counsel for the plaintiff, asked leave to file an amended complaint adding three additional counts intended, as he said, "to set up circumstances with respect to the jurisdictional issue that has arisen by reason of the Flora case decided by the United States Supreme Court as recently as last June." (Flora v. United States, 357 U.S. 63, 78 S.Ct. 1079, 2 L.Ed.2d 1165, decided June 16, 1958; and rehearing granted June 22, 1959, 360 U.S. 922, 79 S.Ct. 1430, 3 L.Ed.2d 1538.) And, in explaining his position, he stated:

"And these additional grounds in the complaint have been added solely for the purpose of setting out circumstances which we feel would go to that jurisdictional issue if there were any question on the original complaint about it with respect to the Flora case. We feel that the original complaint is adequate, because the Flora case is clearly distinguishable from this case. But the fact remains that in order to protect the rights of this plaintiff fully we felt that an amended complaint should be filed for the purpose of protecting him with respect to the other grounds upon which this suit can properly be brought, going solely to the jurisdictional issue, so that if by any chance it were the decision of the Court or the Court of Appeals that the Flora case did apply to this case, we would still be in court and the jurisdictional issue would be, we feel, put at rest by reason of any one of the three additional grounds."

In the course of his remarks in reply to Mr. Bailey, Mr. M. Carr Ferguson, of counsel for the United States, said:

"In the Flora case the tax in question was an income tax, which of

course is assessed annually for the full year. There the plaintiff, who had brought the refund suit, had not fully paid the taxes assessed for the year in question. * * *

"Now, in this case we have a cabaret tax plus penalties and interest thereon which are assessed as part of the tax. The cabaret tax is not assessed on an annual basis, but for the rather long period of time involved here the cabaret tax, I understand, was assessed monthly. A deficiency assessment was made by the Internal Revenue Service covering several years of the cabaret tax. On the books of the Revenue Service the assessment was actually made as one lump-sum deficiency, but of course it covered several periods.

"I understand from Mr. Bailey that the amount paid here by the plaintiff, which was $3,500, is enough to satisfy at least one period and probably more periods of this deficiency assessment. * * * "

It will be noted from that portion of Mr. Ferguson's statement, just above quoted, that there was one tax interval or one taxable period that was fully paid. Previously, in his statement he had informed us that the cabaret tax here involved was assessed monthly and that the plaintiff, by payment of $3,500, paid enough to satisfy at least one period and probably more periods of this deficiency assessment.

With the acquiescence of counsel for the defendant, the proposed amended complaint was filed. Count One of the amended complaint is a duplicate of the original complaint and each of the three additional counts is stated alternately.

While it does not appear that defendant filed or served an answer or other responsive pleading to the amended complaint, the case was tried on the theory that the allegations contained in the different counts of the amended complaint were denied by the defendant.

The following are agreed facts appearing in the pre-trial Order made and filed at the beginning of the trial:

"I. At all times during the period October 1, 1943 to October 31, 1950, both dates inclusive, and at all times since October 31, 1950 and to the present date, the plaintiff was and is a resident and citizen of the State of Oregon, residing at Albany, Oregon. The matters in controversy here are cabaret taxes, and penalties and interest thereon, assessed against the plaintiff under the Internal Revenue Code as follows:

| | |
|---|---|
| Taxes assessed under Section 1700(e) of the Internal Revenue Code [26 U.S.C.A. § 1700(e)] | – $18,032.30 |
| Penalty assessed under Section 1718(c) of the Internal Revenue Code [26 U.S.C.A. § 1718(c)] | – 18,032.30 |
| Penalty assessed under Section 3612(d)(1) of the Internal Revenue Code [26 U.S.C.A. § 3612(d)(1)] | – 4,508.18 |
| Interest assessed under Internal Revenue Code | 5,507.42 |
| Total | $46,080.20 |

"Assessment of the above cabaret taxes, penalties and interest thereon, for the periods between October 1, 1943 and October 31, 1950, was made by the Commissioner of Internal Revenue on September 18,

1952, and a payment of $3,500.00 in satisfaction of the liabilities so assessed for the earliest period or periods involved herein, was made by the plaintiff to the District Director of Internal Revenue on February 27, 1956.

"II Except as hereinafter indicated, the plaintiff operated a restaurant at Albany, Oregon, continuously during the period October 1, 1943 to October 31, 1950, the street address of which said restaurant was 222 West Second Street, Albany, Oregon. The floor plan of the restaurant remained the same throughout the entire period October 1, 1943 to October 31, 1950.

"III During the entire period October 1, 1943 to October 31, 1950, the restaurant was closed all day on Wednesday of each week. The restaurant was closed all day on each of the days during the periods indicated and no tax was assessed therefor:

"October 1, 1944 to September 8, 1944, inclusive;

"August 1, 1945 to September 13, 1945, inclusive;

"July 4, 1946 to March 1, 1947, inclusive;

"July 19, 1948 to August 19, 1948, inclusive;

"July 24, 1949 to September 8, 1949, inclusive.

"In addition to the above periods when the restaurant was closed there was no cabaret tax assessed for the period from October 1, 1948 to January 31, 1949, when the back room was used as a waiting room for the Greyhound Bus Lines."

The basis of defendant's claim of cabaret tax liability is shown in Paragraph II of "Defendant's Contentions" contained in the pre-trial Order which is as follows:

"The sales of refreshments, services, and food in the plaintiff's restaurant from October 1, 1943 to October 31, 1950, attributable to patrons having access to the dancing facilities of the restaurant during the hours when dancing was permitted or occurred were subject to the cabaret tax. In the absence of records kept by plaintiff of the portion of his receipts attributable to such sales, the Commissioner estimated that they constituted a minimum of 20% of the restaurant's total sales for each of the months in said period * * *."

The pre-trial Order concluded with the following:

"Now It Is Ordered that the admissions and denials as aforesaid, and the stipulations and contentions of the parties as aforesaid, be and they are hereby made of record herein; that all pleadings herein be and they are hereby ordered amended to conform to the foregoing; that the issues on the trial of said cause be limited to those hereinabove set forth; and that this order shall control the subsequent course of this cause unless modified at the trial to prevent manifest injustice."

Defendant, relying upon the Flora case, argues that the Court lacks jurisdiction over this suit for refund for the reason that the taxpayer has failed to pay the full amount of the claimed tax deficiency for cabaret excise taxes, and contends that the Court has jurisdiction over the Government's counterclaim for the unpaid balance of the assessment.

Plaintiff distinguishes the Flora case. He states in his opening brief:

"Since income taxes flow from calculations involving considerations of exemptions, deductions and credits, the taxable item or event for income taxes is the taxpayer's tax year. Therefore, in order to raise the jurisdiction of the District Court in an income tax suit, it is necessary to pay the full amount of the deficiency assessed for the tax year. This rule, however, is not applicable to cabaret taxes, where the taxable

item or event is not the tax year, but one month's or one day's gross receipts, or the total amount paid by one patron. Therefore, applying the holding of the court in the Jones case to the facts of the case at bar, it is necessary to conclude that the plaintiff's payment of $3,500.00 constitutes a payment in full of the cabaret taxes for any one or all of these periods, and thus, the Federal District Court has jurisdiction."

The Jones case referred to by counsel is Jones v. Fox, D.C.Md., 162 F.Supp. 449, 468 which is a case similar to this and where, like here, it was urged that the Court lacked jurisdiction for refund because the taxpayer had failed to pay the full amount of the tax deficiency for cabaret taxes. District Judge R. Dorsey Watkins, in opinions written shortly before and after the Supreme Court's decision in the Flora case, held that the District Court had jurisdiction in a suit for refund of an excise tax where only a part of the tax assessed had been paid. In the course of his addendum, the Judge stated:

"[11] The Flora case dealt with a deficiency in income tax. The instant case deals with a deficiency assessment of excise taxes. Without elaborating upon what has already been said in this opinion regarding the lack of jurisdiction in the Tax Court over excise taxes with concomitant hardship to the taxpayer and the absence of alternative remedies, such as the Supreme Court indicated would be present in the case of suit for recovery of income tax, it is necessary to re-examine the divisible nature of the excise tax.

"'Income taxes and estate taxes flow from calculations involving complicated considerations of credits, exemptions, etc. The resulting tax has been influenced by and reflects these considerations. They are not naturally separable as in the case of the stamp tax. It is a wise law that governs their prepayment

before suit can be brought. Otherwise, the power of collection of taxes would be continuously impeded and rendered practically useless. But in the case of these separable items the issue is clear-cut. There can be no complicated questions of credits, exemptions, and the like. It is simply an issue of whether or not the stamp should be applied and in what amount.' Friebele v. United States, D.C.N.J.1937, 20 F.Supp. 492, 493.

"Relying on Friebele v. United States, this court holds that if prepayment of a cabaret tax 'deficiency' is a prerequisite to suit, this requirement is met by payment in full of the tax on any independent taxable item or event even. although this payment may constitute but a partial payment of the entire assessment. Geer v. Birmingham, D.C.Iowa 1950, 88 F.Supp. 189, 191, the leading case in the field of cabaret taxes and one expressly recognized by Congress as authoritative in determining whether or not an establishment is operating as a cabaret or as a dance hall, dictates the conclusion that where the tax is not collected from the patron but is assumed by, and paid by, the person owning and operating the establishment, the taxable event constitutes one day's receipts and that payment in the sum of twenty percent of gross taxable receipts for one day constitutes payment of the 'cabaret tax' in full. This conclusion is supported in part by administrative regulations. 26 C.F.R. section 101.32 * * *.'"

This Court is satisfied that it has jurisdiction over plaintiff's suit for refund.

Defendant, in its counterclaim, among other things, alleges:

"On or about February 27, 1956, plaintiff paid on said assessment the sum of $3,500.00, leaving an outstanding balance due on said assessment of $42,580.20, plus interest.

"Despite due notice and demand, plaintiff has neglected or refused to pay all or part of said sum of $42,-580.20 which is due and owing to the United States of America.

"Wherefore, the United States of America prays for judgment against plaintiff in the amount of $42,580.20, plus interest and costs, and for such other relief as this Court may deem just."

Defendant in its brief comments on this counterclaim as follows:

"The additional question presented in this respect is whether the Court has jurisdiction over the Government's counterclaim if it lacks jurisdiction over the taxpayer's claim for refund. The Government takes the position that jurisdiction does lie on the counterclaim. However, in view of the decision of the Ninth Circuit Court of Appeals in Freeman v. United States (decided March 26, 1959), 265 F.2d 66, which the Government believes is erroneous, we will not argue the position. It is understood, of course, that the Government does not waive its contentions in this regard."

In Freeman v. United States, 9 Cir., 265 F.2d 66, 67, 68 the Government, as it does here, urged the Court to dismiss the complaint and proceed with its counterclaim. While plaintiff's complaint, having to do with an excise tax, is not vulnerable under the Flora rule, the Freeman case does support this Court's view that it has jurisdiction of defendant's counterclaim. The reasoning of Judge Hamley is applicable under the situation in the present case. The same identical question is presented by the counterclaim as that presented by plaintiff's complaint, namely, the legality of the cabaret tax assessment. In the course of his opinion Judge Hamley stated:

"[1] In 1952 for the first time the Navy withheld sums from his retirement pay for taxes, the total amount withheld for the year being $22.10. On March 22, 1953, following the procedure specified in § 51 (f), the Commissioner of Internal Revenue assessed Freeman's 1952 income tax at $279. Notice of this assessment together with demand for payment, less the $22.10 withheld, was made upon Freeman.

"Freeman did not pay the sum demanded, but instead filed a claim for the amount withheld. His claim was denied, whereupon Freeman instituted this action on October 11, 1954, without first paying the full amount of tax assessed for 1952. As before indicated, the government then counterclaimed to recover the amount of taxes claimed to be owing for 1952.

"We turn first to the question of whether Freeman can maintain this refund suit, having failed to allege that he had paid the full amount of income tax assessed against him for 1952. Arguing that under these circumstances Freeman's complaint must be dismissed, the government cites Flora v. United States, 357 U.S. 63, 78 S.Ct. 1079, 2 L.Ed.2d 1165.

"In Flora it was held that a taxpayer must pay the full amount of an income tax deficiency assessed by the Commissioner of Internal Revenue before he may challenge its correctness by a suit in a federal district court for a refund under 28 U.S.C.A. § 1346(a)(1). Appellant argues that our case is to be distinguished from Flora because there has been no deficiency assessment here and, unlike Flora, Freeman does not seek refund of a part payment of a deficiency assessment.

"In view of the counterclaim which has been interposed, this suit no longer involves only the right of the taxpayer to such a refund. It also involves the right of the government to recover the claimed bal-

ance of the assessed tax for 1952. Moreover, the right claimed by Freeman in his complaint and by the government in its counterclaim present precisely the same legal question based upon the identical and uncontroverted facts. That question is whether the retirement pay which Freeman received in 1952 was of a kind which is exempt from taxation.

"While the government wishes us to dismiss the complaint, it wants to proceed with the counterclaim. The latter request is a proper one, since the counterclaim has an independent basis in § 7401 of the Internal Revenue Code of 1954, 26 U.S.C.A., and 28 U.S.C.A. § 1345. But if we proceed with the counterclaim and the government prevails, this will also be dispositive of Freeman's refund claim, whether or not his complaint is dismissed. On the other hand, if we proceed with the counterclaim and Freeman prevails, prior dismissal of his complaint results in this absurdity: he would have to pay the balance of a tax which we have said he does not owe before he could enforce a refund of the amount erroneously withheld.

"We therefore conclude that regardless of whether Freeman's complaint, if it stood alone, would be vulnerable under the Flora rule, the presence of a counterclaim involving precisely the same issues, which the government desires to press, makes application of that rule inappropriate here."

In Paragraph 11 of its first amended answer and counterclaim, the Government alleged:

"This counterclaim is authorized by the Commissioner of Internal Revenue and is brought at the direction of the Attorney General."

This is evidently for the purpose of showing authorization for the counterclaim required by § 3740 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3740, the counterpart of § 7401 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7401. While said Paragraph 11 is denied in plaintiff's reply on the basis of lack of information, plaintiff, at least by implication, admits that the presentation of the counterclaim was authorized as required by said § 3740 of the Internal Revenue Code of 1939 in Paragraph IV of plaintiff's contentions set forth in the pre-trial Order as follows:

"This Court has jurisdiction of this matter for the period October 1, 1943 to October 31, 1950, by reason of defendant's counterclaim for the deficiencies presently assessed but unpaid, for the remaining monthly taxable periods herein involved and in order to avoid a multiplicity of actions with respect to the matter in controversy."

Switzer Brothers, Inc. v. Chicago Cardboard Co., 7 Cir., 252 F.2d 407, is cited in Freeman, 265 F.2d 69, under Footnote 5:

"On the general proposition that a counterclaim under which affirmative relief is sought is sustainable without regard to what happens to the original complaint, * * *."

In Switzer Brothers, the Court stated [252 F.2d 410]:

"[1] It appears to be settled that where a counterclaim states a cause of action seeking affirmative relief independent of that stated in the complaint, the dismissal of the complaint does not preclude a trial and determination of the issues presented by the counterclaim. Lion Mfg. Corp. v. Chicago Flexible Shaft Co., 7 Cir., 106 F.2d 930, 933; Haberman v. Equitable Life Assurance Society of the United States, 5 Cir., 224 F.2d 401, 409."

Cabaret taxes were assessed against plaintiff pursuant to § 1700(e)(1) of the Internal Revenue Code of 1939, which provides in part as follows:

"A tax equivalent to 20 per centum of all amounts paid for admission,

refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The term 'roof garden, cabaret, or other similar place' shall include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection wtih the serving or selling of food, refreshment, or merchandise."

In a cabaret tax case, Judge Irving R. Kaufman in Hover v. United States, D.C. S.D.Cal., 158 F.Supp. 179, 182, pointed out that laws in respect to taxation should be construed and applied with a view of avoiding, so far as possible, unjust and oppressive consequences. He also held (at page 184):

"[4–6] * * * The taxing statute requires that there be both (1) a public performance and (2) the patrons be entitled to view any portion of such a performance, as a condition for the imposition of the cabaret tax."

He had under consideration 26 U.S.C.A. (I.R.C.1954) § 4231(6) which, for present purposes here, is identical with § 1700(e)(1), Internal Revenue Code 1939.

From the testimony elicited and the arguments of the Government, it is apparent that the Government's claim of cabaret tax liability in this case is based entirely upon its contention that dancing privileges were offered and afforded patrons of plaintiff's restaurant, thereby furnishing a public performance for profit by or for any patron or guest who was entitled to be present during any portion of such performance.

■ The Court holds, as plaintiff seems to concede, that if plaintiff, in the operation of his restaurant, had furnished music by a jukebox and provided a space in which patrons were permitted to dance, plaintiff, in so operating his restaurant, furnished a public performance for profit by or for any patron or guest entitled to be present during any portion of such performance and would be subject to cabaret taxes pursuant to § 1700(e)(1), Internal Revenue Code 1939.

■ However, the Court is of the opinion that cabaret tax liability would not have been incurred if dancing had been prohibited, and if plaintiff, by himself or through his employees, had constantly and in good faith promptly prevented or stopped attempted dancing in his place of business. Under such circumstances, there would be no public performance and the patrons would not be entitled to view any public performance. The existence of a floor suitable for dancing, the availability of jukebox music, and the occasional thwarted attempts by patrons to dance are not in themselves alone sufficient to incur a cabaret tax liability.

There is a sharp conflict in the testimony. Plaintiff testified that dancing had been permitted "from 1938 up to the middle of 1943." Plaintiff and witnesses in his behalf testified that the plaintiff had not permitted dancing in his restaurant from the middle of 1943 to 1950 except for a two-week period in March of 1947 and that plaintiff and his employees stopped any attempts at dancing.

Mr. W. A. Vollstedt, a businessman of Albany, Oregon, testified that during the period from October, 1943, to December, 1950, he with his wife patronized plaintiff's restaurant,

"about three or four times a week during the day, and I would say about four or five nights a week my wife and I would go down and have dinner or have a cup of coffee or something like that."

and that they were frequently there on weekends, Friday and Saturday nights.

As to dancing, he testified that he did not see any dancing during the period from October, 1943, to December, 1950, except

> "what you might call accidental dancing. Up until 1943 we danced there a little bit, and then Jim advised us that he didn't have a cabaret license, and so there wasn't any dancing any more. At first, why, people that were in the habit of going in there and dancing when someone put a nickel in the jukebox, they would get up to dance, and one of the waitresses or Mrs. Churchill would go and tell them that they didn't have a cabaret license and dancing was not permitted."

To the same effect was the testimony of Mr. R. A. Ralston who was, including the period involved here, engaged in the automobile business in Albany, Oregon.

Mr. John H. Blalock, a retail grocer of Albany, and a patron of Christie's restaurant during the period from October, 1943, to December, 1950, testified that in 1942 or 1941 he observed dancing going on in the back room of the restaurant; that in 1943 he was told on one occasion that if he did not stop dancing he would be required to leave the place, and that he did not attempt to dance after that occasion. He also said that he had overheard either plaintiff or his employee, Mrs. Bess Churchill, tell other customers not to dance in the place.

Helen Hollis Gaskill, an employee of Sears Roebuck farm store in Albany, was a patron of the restaurant during lunchtimes and frequently during the evening hours including Saturdays, during the period 1943 to 1950. She said that dancing was not allowed and that when people would start to dance, they were told to stop. She also described the floor of the back room as not suitable for dancing.

Mrs. Pauline Akin, a patron of the restaurant during the period 1943 to 1950, stated that she had not observed dancing except occasionally and that when some one attempted dancing "they were always stopped before they had gone too far."

Other witnesses including former employees of Mr. Christie also testified to the same effect.

Witnesses Berlin C. Niles, Stanley J. Orzechowski, and James Lewelling testified favorably for defendant on the subject of dancing or no dancing in the restaurant.

■ The Court is of the opinion that the apparent conflict between the testimony of plaintiff's witnesses and defendant's witnesses on this question of dancing must be resolved in favor of the plaintiff.

The witness James Lewelling testified that on occasions of two or three times a week he would visit the back room at Christie's during the years 1947 and 1948, and that he saw dancing there on numerous occasions but did not see more than two couples dancing at any one time, and usually it would be just one couple. In response to the question,

> "Did you ever see the waitress or anyone else working for Mr. Christie stop the dancers and tell them to sit down?"

he answered,

> "I can't honestly recall whether I have seen that or not. I have a hazy recollection of possibly Bess Churchill having said something like that. * * * I say, sir, that Mrs. Churchill, Bess Churchill, may have made some statement to that effect, or I may have picked that up from listening to her testimony last Monday. I can't honestly answer that question."

On cross-examination his testimony was:

> "Q. Ordinarily on these occasions do you have any idea how long they danced? If one or two couples were dancing back there, when you saw them do you have any idea how long they would continue to do so, or how long this dancing went on on any one of these evenings? A. Well, the dancing would be sporadic. Usually there would be a couple sit-

ting alone, or two couples, and they would dance maybe two or three times during the evening.

"Q. That was a typical performance on these occasions when you were in there? A. That was typical of the times that I was dancing, yes.

"Q. Mr. Lewelling, would you characterize this back room of Christie's as being an appropriate place to dance? A. I most certainly would not.

"Q. What was wrong with it? A. The floor was chewed up to where it was rough. I had occasion myself to dance with a girl who was taller than I, and she got a sliver about an inch and a half long in the bottom of her foot from the floor. It was cold, with a very high ceiling. It was dark, * * *.

"Q. Do you have some recollection about Bess Churchill warning people not to dance in the place? A. I say, that is an impression, I wouldn't want to call it a recollection."

The Lewelling testimony may be said in some measure to support both plaintiff's and defendant's contentions. His recollections as to the subjects to which he testified seemed hazy in some respects. His testimony cannot be accepted in repudiation of the testimony of plaintiff's witnesses.

The Court gives no credence to the testimony of the witnesses Niles and Orzechowski on the question of dancing.

During the period October 1, 1943, to October 31, 1950, except for the month of March, 1947, in the conduct of his restaurant, plaintiff did not offer a public performance, no dancing privileges having been afforded.

Plaintiff admittedly permitted dancing in the back room of the restaurant for a period in March, 1947, and thereby did, during said month, furnish a public performance for profit within the meaning of § 1700(e)(1) of the Internal Revenue Code of 1939, and plaintiff's patrons were permitted to be present during such performance. He did not file a cabaret tax return nor pay any cabaret tax covering said period. The room referred to throughout the testimony as the back room is admittedly the only place in the establishment where dancing was permitted. However, it appears from the evidence that patrons of the front portion of the restaurant might see and could take advantage of the dancing privileges afforded in the back room. This is borne out by the testimony of plaintiff's witness, Pauline Akin, as shown in the transcript, pp. 107 and 108. She testified in effect that on occasions she saw people go from the front part of the restaurant to the back room and begin dancing and that this occurred "every once in a while." She also testified that most of the customers were served in the front part of the restaurant and that a person sitting at the counter in the front part of the restaurant could see a space in the back room five or six feet wide.

That patrons utilizing the front room were, during March, 1947, permitted to view or participate in the dancing carried on in the back room is apparent from the evidence.

James F. Steele, formerly of the Internal Revenue Service, testified that he computed the summary of gross receipts, Exhibit B attached to the pre-trial Order. And it is admitted that Exhibit C, attached to the pre-trial Order, is a summary of gross receipts as reported in the records of Mr. Christie's business. He explained that in arriving at the figures set out in Exhibit B, he took into consideration Mr. Christie's bank deposit slips for the periods involved and that his analysis of the bank deposits revealed that the bank deposits exceeded by a considerable amount the gross receipts shown on the taxpayer's books and records. He attempted to reconcile with Mr. Christie the discrepancy shown by a comparison of Exhibit B with the books and records of the restaurant and Mr. Christie could offer no explanation.

In view of this apparent inadequacy of plaintiff's books and records,

the Internal Revenue Service is warranted in relying upon its work sheets and Exhibit B in computing the tax for March, 1947.

Among the agreed facts recited in the pre-trial Order is the following:

"There is attached hereto, marked Exhibit B, and by this reference made a part of this Pre-Trial Order, a statement of the gross receipts from the operation of the restaurant in each of the months of June, 1942, to December, 1950, both months inclusive, as determined from bank deposits. The gross receipts set forth in Exhibit B were computed by eliminating from the total deposits made in the plaintiff's bank accounts, in the months of June, 1942 to December, 1950, both months inclusive, all deposits which could be identified as not constituting receipts from the restaurant."

Mr. Karl Thomason, a witness called by plaintiff, in identifying plaintiff's Exhibit 12, stated:

"It is a statement from the Appeal Division here in Portland regarding the subject of this cabaret tax, * * *."

His testimony further shows that to Exhibit 12 are attached supporting sheets or schedules showing the receipts of this restaurant by months including the period October, 1943, to October, 1950. The supporting sheets show for March, 1947, the following:

"Gross receipts $8,009.27
Receipts subject to
 cabaret tax 1,601.85
Tax due 320.37"

Like Exhibit 12, Exhibit B attached to the pre-trial Order also shows $8,009.-27 as gross receipts for the month of March, 1947.

 The Court determines that plaintiff's tax liability for the month of March, 1947, originally was the sum of $320.37.

The plaintiff, having failed to file a return for March, 1947, became subject to having added to the tax 25% of its amount as a penalty under the provisions of § 3612(d)(1), Internal Revenue Code 1939. It therefore becomes unnecessary to consider, for our purposes in determining the total amount due, whether or not he wilfully failed to pay the tax for said month for the reasons set out in the last sentence of § 1718(c), Internal Revenue Code 1939, which is:

"No penalty shall be assessed under this subsection for any offense for which a penalty may be assessed under authority of section 3612."

Therefore, the total amount to which the United States is entitled on account of the cabaret tax liability of the plaintiff for March, 1947, is the sum of $320.37, plus 25% penalty, plus interest as provided for by § 1717, Internal Revenue Code 1939, from the time when the tax became due until February 27, 1956, the date on which plaintiff paid $3,500 on the claimed tax deficiency, amounting in all to the sum of $616.83.

It was held in Burrell v. Fahs, 5 Cir., 232 F.2d 163, Syllabus 2:

"Statute and regulation requiring filing of claim for refund or credit as condition precedent to maintenance of suit or proceeding for recovery of tax or penalty wrongfully assessed or collected do not require that taxpayers, in addition to showing that Commissioner's assessment was erroneous, establish exact amount to which taxpayers are entitled."

 The plaintiff here is entitled to a refund of at least a portion of the payment of $3,500 made February 27, 1956, on the alleged deficiency assessment. While the claim for refund was for but $2,000 of said amount, the Court is not limited to that amount in determining the proper refund to be made. If it is not necessary that the claim for refund establishes exact amount to which plaintiff may be entitled, the fact that the claim for refund here was made for $2,000 would not of itself limit plaintiff's recovery from the $3,500 payment on the

alleged deficiency assessment to that sum if, from the evidence, it appeared that plaintiff was entitled to a greater portion of the $3,500 payment.

The Court's view of the evidence in this case is such that it would, on motion, reopen the case and permit amendment to the plaintiff's complaint to show a demand for $3,500 instead of $2,000. To obviate that idle ceremony, the Court will deem the complaint so amended to conform to the evidence. Rule 15(b), Fed.Rules Civ.Proc., 28 U.S. C.A.

Considering the question whether plaintiff is entitled to more than $2,000 as a refund as an issue not raised by the pleadings here, it may be said that that "issue" appears from the evidence received in this case without objection that such "issue" was not made by the pleadings. The issues as to whether a refund should be made and if so, the amount thereof, were here tried by "express or implied consent of the parties." The allowance of a refund in a sum exceeding $2,000 finds support in the evidence introduced in this case. By deeming the amendment to be made as above indicated, defendant cannot be said to be prejudiced in the sense that it could claim surprise and lack of opportunity to meet the issue of the amount in its defense. The issue of the legality of the excise tax assessment was plainly put to the Court by the pleadings in the case. The defendant had at all pertinent times during the course of this action, and prior to the bringing of this action, the means of calculating and determining the amount to which plaintiff would be entitled as a refund in the event the Court found that the excise tax assessment was unauthorized. Under all the circumstances here, the amount of the demand for refund is immaterial or surplusage.

From the evidence received in this case it should be adjudged that plaintiff is entitled to recover $3,500 less $616.83, or the sum of $2,883.17. Defendant is not entitled to recover any sum upon its counterclaim.